UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALDINE DARDEN, | Case No. 1:12-cv-01001-EPG (PC) |
| Plaintiff, | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT BY DEFENDANT SCOTT H. DRISCOLL |
| v. | |
| SCOTT H. DRISCOLL, | (ECF No. 84) |
| Defendant. | |

## I. INTRODUCTION

Plaintiff Geraldine Darden is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action. Plaintiff filed her initial Complaint on June 21, 2012 and the current operative version of the Complaint is the First Amended Complaint (the "FAC"), as narrowed by the Court's screening order on May 18, 2015. (ECF Nos. 1, 19, 26.) The FAC alleges a claim under 42 U.S.C. § 1983 for deliberate indifference to Plaintiff's medical needs. In particular, Plaintiff alleges that Defendant Scott H. Driscoll, a physician, failed to appropriately diagnose a tumor in an examination on June 27, 2009 and falsified Plaintiff's medical records to state that he had performed a diagnostic test that he had not, in fact, performed.[1]

On August 4, 2016, Defendant filed a motion for summary judgment contending that no

---

[1] The FAC, as narrowed, does not include a state claim for medical negligence. (Order Dismissing Defendants Spencer and Blackford, ECF No. 26; Order Following Telephonic Hearing 11:1-7, ECF No. 64; Plaintiff's Response to Statement of Undisputed Facts 157 ("Plaintiff did not allege any negligence claim"), ECF No. 86.) Rather, the alleged misdiagnosis of Plaintiff's tumor forms part of the basis for her deliberate indifference claim. *Id.*

1

evidence exists to suggest that he knew of or disregarded any risk to Plaintiff's health or safety in her medical care. (ECF No. 84.) Plaintiff filed an opposition brief to the motion, along with several exhibits of documents that she had procured in discovery or elsewhere. (ECF No. 86.) Defendant filed a reply brief. (ECF No. 87.) Pursuant to Local Rule 230(l), the motion was then taken under submission and is now before the Court.[2]

## II.    BACKGROUND

Plaintiff is a prisoner at Central California Women's Facility in Chowchilla ("CCWF") and has received multiple mammograms during her incarceration. She received mammograms in 2001, 2002, 2004, 2005, and 2007, each of which was interpreted by doctors other than Defendant and each of which was negative for evidence of malignant tumors. On June 26, 2008, Plaintiff had a physical examination of both breasts. Her left breast had no palpable masses, but there was a mass in her right breast. On July 21 and 22, 2008, Plaintiff received a mammogram and ultrasound of her right breast. Defendant, who interpreted the mammogram and ultrasound, found multiple cystic mases, although these were consistent with Plaintiff's 2007 mammogram. He also found a tiny solid lesion in her right breast and recommended a six month follow up ultrasound as a result. He assessed the image as "Bi-Rads 3," or "probably benign." On October 3, 2008, Plaintiff underwent a right breast lumpectomy. The mass removed was benign.

On June 27, 2009, Plaintiff received a mammogram, which was interpreted by Defendant. In reviewing the mammogram image, he found:

> Bilateral spherical nodular densities numbering too many to count without microcalcification, speculation, or architectural distortion. Compared to a study made on 11/7/07 dominant masses on the right have either been removed or disappeared and dominant masses on the left appear somewhat smaller than previously. Benign retroareolar macrocalcification left breast. The findings are nonspecific but appear benign and could be related to multiple benign cysts, neurofibromatosis, or multiple fibroadenomas.

(Evidence in Support of Motion of Defendant Scott Driscoll, M.D. for Summary Judgment, Exh. A, ECF No. 84-4 at pg. 18.) He assessed the image as "Bi-Rads 2," or "benign." At the bottom of the report, he also noted that "[r]adiologic interpretation includes Computer-Aided Detection

---

[2] All parties have consented to the jurisdiction of a United States Magistrate Judge under 28 U.S.C. § 636(c)(1). (ECF Nos. 39, 69.)

2

(CAD) Second Look." *Id.*

On October 6, 2010, Plaintiff received a mammogram, which was interpreted by Donald Blackford, M.D. In his radiology report, Dr. Blackford wrote that:

> Again noted are multiple rather discrete nodules within both breasts. They are fewer within the right breast when examinations are compared, and the ones within the left breast do appear smaller. They are quite discrete and, the overall appearance does suggest fibrocystic disease. Also, the multiplicity and bilaterality suggests benign. There is no new discrete worrisome mass in either breast. There are no worrisome calcifications.

(Evidence in Support of Motion of Defendant Scott Driscoll, M.D. for Summary Judgment, Exh. A, pg 1633, ECF No. 84-4.) Dr. Blackford assessed the image as "Bi-Rads 2," or "benign." Dr. Blackford noted at the bottom of his report that the "[r]adiologic interpretation includes Computer-Aided Detection (CAD) Second Look." *Id.*

On September 12, 2011, a physical examination of Plaintiff found a large lump in Plaintiff's left breast. A mammogram was conducted and interpreted by Bradley Bettinger, M.D., who found that "[c]ompared to previous study of 10/06/2010, there has been the interval appearance of an enlarging and/or new nodular density in the left breast." *Id.* at 1628. He suspected malignancy and recommended an ultrasound. On September 28, 2011, Dr. Blackford interpreted a mammogram of Plaintiff's left breast and noted that "[t]here is now a large, discrete mass in the mid region, left breast, that most likely was present on 10/06/2010, but has markedly enlarged." *Id.* at 1627. He recommended an ultrasound follow up.

Over the course of the next several months, doctors determined that the mass in Plaintiff's left breast was cancerous and she received treatment, including lumpectomy and, eventually, a mastectomy. Plaintiff declined chemotherapy.

## III.   LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca* ("*Albino II*"), 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("If there is a genuine dispute about material facts, summary judgment will not be granted.") A party asserting

that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), *quoting* Fed. R. Civ. P. 56(c). If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the court must determine "whether a fair-minded jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. "[C]onclusory allegations unsupported by factual data" are not enough to rebut a summary judgment motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), *citing Angel v. Seattle-First Nat'l Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981).

In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties, but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). In judging the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2.

### B. Deliberate Indifference

"The Eighth Amendment guarantees adequate medical care for inmates." *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996). To establish an Eighth Amendment violation based on a failure to provide adequate medical care, the plaintiff must show the official was deliberately indifferent to a serious medical need. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1081 (9th Cir. 2013). A serious medical need means that failure to treat the prisoner's condition "could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.*

An official is deliberately indifferent if the official engaged in a purposeful act or failed to respond to the prisoner's pain or medical need, and the indifference caused harm to the prisoner. *Id.* "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown in the way in which prison [officials] provide medical care." *Id.* (quotation omitted).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id.* at 1057, *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.*, *quoting Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Id.* at 1060. "[E]ven gross negligence is insufficient to establish a constitutional violation." *Id.*, *citing Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990)).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted). To prevail, a plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

## IV. DISCUSSION

### A. Evidence Submitted by the Parties

Defendant submits the following evidence on the issues of: (1) Defendant's use of Computer-Aided Detection ("CAD") in his mammogram study of Plaintiff; and (2) Defendant's assessment that Plaintiff's cysts were benign on June 27, 2009[3]:

- Radiology reports completed by Defendant summarizing his review of Plaintiff's mammograms and ultrasounds from July 21 and 22, 2008;
- The radiology report completed by Defendant summarizing his review of Plaintiff's mammogram from June 27, 2009;
- A radiology report completed by Donald Blackford, M.D. summarizing his review of Plaintiff's mammogram from October 6, 2010;
- Medical records from Plaintiff's September 12, 2011 physical examination;
- A radiology report completed by Bradley Bettinger, M.D. summarizing his review of Plaintiff's mammogram from September 19, 2011;
- A radiology report completed by Donald Blackford, M.D. summarizing his review of Plaintiff's mammogram from September 28, 2011;
- A declaration by Vivian Wing, M.D., F.A.C.R. discussing the use of CAD in radiological studies and with respect to Plaintiff's case (the "Wing Decl.");
- A declaration by John M. Glaspy, M.D., M.P.H. discussing the course and type of Plaintiff's cancer (the "Glaspy Decl."); and,
- A declaration by Sonja M. Dahl, Esq., counsel of record for Defendant, who states the radiological studies subpoenaed from CCWF were all produced to her in digital form (the "Dahl Decl.").

Plaintiff largely concedes the above evidence and admits the majority of Defendant's asserted facts, although she challenges Defendant's interpretation of the June 27, 2009 mammogram. Plaintiff also challenges both of Defendant's expert declarations and contends that there is no evidence that Defendant actually used CAD. She submits[4]:

- A short article from *Cancer Imaging*, dated April 13, 2005, by Ronald A. Castellino, M.D., summarizing the use of CAD;
- An undated advertisement for R2 ImageChecker CAD software, a CAD program; and,

---
[3] Defendant also submits a number of medical records that document the progression of Plaintiff's treatment. Because that evidence is not material to the particular issues in dispute, it is not summarized here.

[4] As with Defendant, Plaintiff submits a number of records that deal with the course of her illness that are not recounted here.

6

- The mammogram images from Plaintiff's June 27, 2009 and September 19, 2011 exams.

**B. Falsification of Plaintiff's Medical Records**

An Eighth Amendment violation based on deficient medical treatment requires that Plaintiff show: (1) a serious medical need, and (2) deliberate indifference in Defendant's response to that need. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012), *citing Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference requires "a purposeful act or failure to respond to a prisoner's pain or possible medical need." *Id.* Plaintiff contends that Defendant intentionally falsified the radiology report from June 27, 2009 to say that he used CAD software to review Plaintiff's mammogram, even though he did not actually use CAD. (Plaintiff's Opposition 10, ECF No. 86.) Such conduct, if proven, could establish the "purposeful act" required for Plaintiff's claim.

In support of this allegation, Plaintiff points to Dr. Castellino's article, which states that CAD requires a "digital data set of the image for analysis. If the image is acquired on x-ray film, such as a film-screen mammogram, the analog image must first be digitized." (Plaintiff's Opposition, Exh. A, ECF No. 86 at pg. 21.) Plaintiff states that her mammogram image was in analog form. Thus, she reasons, it would have been impossible for Defendant to analyze the image with a CAD program.

Defendant argues that the June 27, 2009 mammogram was, in fact, digitized. (Dahl Decl. ¶ 2, ECF No. 88.) Defendant also explains that CAD is only used as an assistive tool, rather than a diagnostic one, by radiologists:

> Computer-Aided Detection is actually computer software that "interprets" radiological images and automatically calls attention to areas of asymmetry, calcification or density for specific review by the radiologist. During the interpretation of a mammogram, the radiologist clicks a button to turn on the software and certain digital markings, such as crosses, arrows or circles, appear around the areas determined by the software to merit attention. Computer-Aided Detection is *not* a diagnostic tool, meaning it does not diagnose an area of concern, or the possibility of cancer. A radiologist can never, and should never, rely upon Computer-Aided Detection as diagnostic. Rather, it is simply software that, with varying degrees of accuracy and helpfulness, suggests certain areas upon which the radiologist may want to focus.
>
> . . .
>
> Typically, the digital markings, such as crosses, arrows or circles, that the

7

> software generates are not preserved after the radiological study has been read and interpreted by the radiologist. The markings are intended to be only temporary signposts, as a further automated step, to help assure that the radiologist will study places digitally processed by the software as needing scrutiny and interpretation. The markings themselves do not diagnose anything. The radiologist must interpret the study itself whether or not Computer-Assisted Detection is employed. The digital markings do not constitute the study itself and are almost never made a permanent part of the patient's medical record.

(Wing Decl. ¶¶ 14, 15, ECF No. 84-4.)

Defendant has put forth evidence suggesting that he did, in fact, perform a CAD "second look" of Plaintiff's mammogram on June 27, 2009. In particular, Defendant has produced: the radiology report noting that he used CAD; an expert declaration stating that it would be normal practice not to save the image with CAD markings in a patient's records, even if a CAD program was run; and a declaration stating that Plaintiff's mammogram was stored and produced in a format that would have allowed a CAD program to be run on it.

Plaintiff, though objecting to Defendant's expert declaration, has not offered any evidence to support her contention that Defendant did not use a CAD program on the mammogram image or that Defendant falsified her medical records. Although Plaintiff contends that the June 27, 2009 mammogram was taken in analog, rather than digital, form, the only evidence she offers is a copy of the mammogram image itself. It is unclear to the Court what format this image was originally stored in. Even if it was originally taken in analog, however, Defendant has amply established that the mammogram was, at some point, digitized, which would make it capable of analysis using a CAD program.

Plaintiff argues that the Wing Declaration should not be admitted on the basis that Dr. Wing is not qualified to provide testimony regarding CAD because she did not provide a clear step-by-step set of instructions explaining how to use CAD in her declaration. (Plaintiff's Opposition 11, ECF No. 86 ("In Dr. Wing's self-proclaimed expertise she disregarded mere rudimentary instructions on the qualifications in providing an expert opinion. The United States Supreme Court has unanimously expressed that any vague descriptions upon which the experts relied are not sufficient, whether individually or in combination to support the expert[']s conclusions when it lacks scientific knowledge."). Plaintiff suggests that the Court would be

better served by adopting Dr. Castellino's views on CAD, as provided in the article she submits. *Id.* at 12.

Dr. Castellino's article does not contradict the statements made by Dr. Wing, however. Both agree that CAD is a software program that is used to perform a "second look" at mammogram images and that the radiologist is ultimately the one who must perform the actual review and/or diagnosis. (*Compare* Plaintiff's Opposition, Exh. A, ECF No. 86 at pg. 21 ("the exam should first be reviewed and interpreted in the usual fashion. Only then are the CAD marks displayed, following which the radiologist re-reviews those areas that are prompted by the CAD system.") *with* Wing Decl. ¶ 14, ECF No. 84-4 ("A radiologist can never, and should never, rely upon Computer-Aided Detection as diagnostic. Rather, it is simply software that, with varying degrees of accuracy and helpfulness, suggest certain areas upon which the radiologist may want to focus.").) And Dr. Castellino is silent on the issue most salient for Plaintiff's case here: whether it would be standard practice not to save a CAD-marked version of the mammogram image for a patient's medical records. Dr. Castellino also notes that an analog image can be converted into digital format and that a CAD program can then be run on the converted image. (Plaintiff's Opposition, Exh. A, ECF No. 86 at pg. 21 ("If the image is acquired on x-ray film, such as a film-screen mammogram, the analog image must first be digitized."). This fact undercuts Plaintiff's argument that the June 27, 2009 mammogram could not have been run through a CAD program because it was taken in analog form.

Dr. Wing is also adequately qualified to discuss the practice and usage of CAD software. Under Rule 702 of the Federal Rules of Civil Procedure, "only relevant and reliable expert opinion testimony is admissible." *U.S. v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006), *citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Testimony "is reliable if the knowledge underlying it 'has a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.*, *quoting Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993). "A trial court should admit medical expert testimony if physicians would accept it as useful and reliable." *Id.* Dr. Wing is a board certified radiologist and is the Chief of Ultrasound and Director of Breast Imaging Services at John Muir Medical Center in Concord, California. (Wing Decl. ¶ 1, ECF No.

84-4.) She has also used CAD on more than one occasion and is familiar with general practices concerning CAD. *Id*. at ¶ 14. This experience is more than adequate to make Dr. Wing's testimony with respect to CAD and her review of Plaintiff's radiology reports admissible. *Stedeford v. Wal-mart Stores, Inc.*, No. 2:14-CV-01429-JAD-PAL, 2016 WL 3844211, at *2–3 (D. Nev. July 15, 2016) (expert testimony by radiologist regarding review of radiographic images admissible).

The Court agrees with Defendant that Plaintiff has not offered sufficient evidence to create a genuine issue of material fact with respect to the falsification of her medical records. Even assuming the June 27, 2009 mammogram was initially taken in analog form, as Plaintiff contends, the evidence indicates that it was converted to digital form thereafter. The evidence also shows that an analog image, once converted to digital form, can be run through a CAD program. Once the CAD program marks up the image, the radiologist would note that a CAD analysis was run in the radiology report and the CAD-marked image would not be preserved in Plaintiff's medical record. All of these facts are entirely consistent with Defendant's version of events and inconsistent with Plaintiff's allegations.

**C. Misdiagnosis of Plaintiff's Tumor**

On June 27, 2009, Defendant determined that Plaintiff had benign calcification in her left breast and recommended that she receive a normally scheduled screening within the next year. Plaintiff argues that Defendant's diagnosis was incorrect and that the calcification was, in fact, a malignant tumor. The implication is that Defendant's failure to diagnose Plaintiff's breast cancer early on led to a delay in her treatment and thus led to more invasive procedures than would have otherwise been warranted.

As noted above, an Eighth Amendment claim on a theory of deliberate indifference requires "a purposeful act or failure to respond to a prisoner's pain or possible medical need." *Whilhelm*, 680 F.3d at 1122. "[A]n inadvertent failure to provide adequate medical care does not, by itself, state a deliberate indifference claim for § 1983 purposes." *Id.* "[M]ere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference." *Shapley v. Nev. Bd. of State Prison Commr's*, 766 F.2d 404, 407 (9th Cir. 1985). Summary judgment is thus

appropriate where there is no genuine issue of fact regarding a defendant's "subjective knowledge and conscious disregard of a substantial risk of serious injury" to a prisoner. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

### 1. *Declarations by Dr. Glaspy and Dr. Wing.*

Defendant submits two declarations, the Glaspy Decl. and the Wing Decl., to support his argument that he acted appropriately in assessing Plaintiff's mammogram. The Glaspy Decl. is written by John M. Glaspy, M.D., a chair in cancer research at the UCLA School of Medicine and associate chief of Hematology-Oncology at UCLA. Dr. Glaspy states, under penalty of perjury, that he has reviewed Plaintiff's medical records and determined that the course of Plaintiff's cancer was such that it "almost certainly would not have been present at the time Dr. Driscoll interpreted the June 2009 mammogram, or even the mammogram done one year later and interpreted by Dr. Blackford." (Glaspy Decl. ¶ 14, ECF No. 84-4, at p. 136.) In particular, Glaspy notes that the cancer would have been "very aggressive":

> Of particular importance, the pathology of the tumor was ER negative, PR negative and Her2/neu, which is called "triple negative." This means that the tumor had no estrogen or progesterone receptors, and was a very aggressive, fast-growing type of cancer. It is not at all unusual for this type of tumor to be quite large when first discovered, as it grows quickly. The fact that the patient had had a negative mammogram approximately 11 months prior to the discovery of the lump in plaintiff's breast is not at all surprising. It is a typical presentation of this type of cancer to appear at a large size within a year of a correctly interpreted negative mammogram. Therefore, the fact that a tumor developed does not mean that something was missed in prior mammograms. In this particular case, it would be extremely unlikely that this cancer would have been present two years prior to its discovery because of its very fast growth rate.

*Id.* at ¶ 12.

Defendant also points to Dr. Wing's review of the June 27, 2009 radiological study as evidence that he acted appropriately:

> Ms. Darden had mammograms of both breasts on June 27, 2009. This study was interpreted by Dr. Driscoll, and is the study at issue in this case . . . Dr. Driscoll recommended Ms. Darden return in one year for a follow up study. I agree with Dr. Driscoll's interpretation and assessment of this study, which shows multiple spherical masses in both breasts which were smaller and size and number compared to the November 2007 study. I agree that the retroareolar macrocalcification in the left breast was benign. Macrocalifications, which look like large white dots on mammograms, are benign. There is no evidence of cancer in either breast. Dr. Driscoll's interpretation was entirely correct. Dr. Driscoll's assessment of the study as being Bi-Rad 2, benign was correct. No further testing

11

> or treatment was needed. Dr. Driscoll correctly recommended that Ms. Darden return in one year for a follow-up screening mammogram.
>
> . . .
>
> Based on my review of the aforementioned materials, my background and training and expertise as a radiologist, I believe that the care and treatment Dr. Driscoll provided to Geraldine Darden in his interpretation of the June 27, 2009 mammogram was correct, was entirely and completely appropriate, and complied with the standard of care for a radiologist in all respects. His impression that there was no evidence of cancer, that there was a benign calcification in the left breast and that there were multiple bilateral spherical masses, which was smaller in size and fewer in number, was correct. His recommendation to follow up in one year for her regular screening mammogram was proper and fully appropriate. There is no error or even hint of error in Dr. Driscoll's interpretation of the study or follow up recommendations.

(Wing Decl. ¶¶ 8, 12, ECF No. 84-4 at p. 120-120.)

### 2. *Plaintiff's responses to the expert declarations.*

Plaintiff argues that Defendant's two experts are incorrect and submits the mammogram images taken by Dr. Driscoll on June 27, 2009 and by Dr. Bettinger on September 19, 2011 (the study that first highlighted a "suspicious finding"). Specifically, Plaintiff notes that the spot on the mammogram that Defendant determined was benign appears to be in the same location as the spot that was later found to be suspicious. Plaintiff also levels several attacks on the Glaspy and Wing declarations and asserts that Defendant has engaged in fraudulent conduct, which is the subject of a separate case (*Driscoll v. Todd Spencer M.D. Med. Group, Inc.*, Case No. 1:11-cv-01776-LJO-BAM).[5] Aside from the reference to this case, Plaintiff does not point to any other evidence of Defendant's subjective intent in interpreting the June 27, 2009 mammogram.

### 3. *Analysis.*

Plaintiff's arguments do not raise a triable issue of material fact with respect to her deliberate indifference claim. While there does appear to be a spot on the 2009 mammogram image that Plaintiff submits, the Wing Decl. accounts for this spot by noting that macrocalcifications, which would be consistent with a diagnosis of "benign," also appear as large white dots on a mammogram image. The Court also notes that the interpretation of these images

---

[5] Although the Court can take judicial notice of the pleadings in *Driscoll v. Todd Spencer M.D. Med. Group, Inc.*, there is little reason to do so. *Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n. 3 (9th Cir. 2002). The *Driscoll* case appears to be a *qui tam* action by Driscoll under the False Claims Act. It is still in the pleading stages and the Court is thus unable to draw any factual inferences from it for the purposes of this motion.

is not at all clear in the absence of expert evaluation—indeed, there appear to be more white spots on the 2009 image than in the 2011 image, even though the 2011 image is the image with suspicious activity. And even if the white spot on the 2009 mammogram image was erroneously read to be benign by Defendant, a merely negligent misreading of the mammogram is not enough to show deliberate indifference, absent some other evidence of Defendant's subjective intent. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) ("A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment."). Thus, Plaintiff needs some other evidence of Defendant's mindset to show that he was deliberately indifferent.

Plaintiff's objections to Defendant's experts are likewise unpersuasive. As discussed above, Dr. Wing is adequately qualified to discuss her interpretation of Plaintiff's mammogram images and medical record. Plaintiff also objects to Dr. Glaspy, arguing that Dr. Glaspy is unqualified and that his statement that Plaintiff's carcinoma was fast-growing and aggressive is incorrect because it differs from testimony that was heard in the case *Rhodes v. United States*, 967 F.Supp.2d 246 (D.D.C. 2013), a medical malpractice case under the Federal Tort Claims Act. As noted above, testimony "is reliable if the knowledge underlying it 'has a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.*, *quoting Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993). "A trial court should admit medical expert testimony if physicians would accept it as useful and reliable." *Id.* Dr. Glaspy's testimony about the likely history of Plaintiff's cancer is unquestionably relevant to this case. He has also authored over 150 peer-reviewed research papers regarding oncology and hematology. His qualifications are thus adequate to testify to the potential course of Plaintiff's cancer.

Plaintiff's more specific argument, however, is that Dr. Glaspy's opinion is not reliable because it does not match the approach used to evaluate cancer growth rates in *Rhodes v. United States*, 967 F.Supp.2d 246 (D.D.C. 2013), which described cancer growth rates in terms of the "Nottingham System" of grading cancers. Plaintiff misreads *Rhodes*. *Rhodes* did not find that the grading system used there was the only acceptable method of evaluating cancers. Rather, the *Rhodes* court was summarizing testimony it received from expert witnesses during a bench trial.

13

*Id.* at 250 ("During a week-long bench trial, the Court heard evidence on the plaintiff's claim against the defendant."); 281 ("The experts disagreed about the importance of the grade for describing the cancer's growth rate, the independent significance of each of the individual component scores, and the importance of certain other indicators for predicting the growth rate of the cancer."). The fact that Dr. Glaspy's analysis does not follow the approach laid out by the experts in *Rhodes* does not invalidate his analysis. Nor is a medical opinion given in the course of a different district court case binding on this Court.

Even were the Court to adopt Plaintiff's proposed framework, however, and evaluate the facts using *Rhodes*, Dr. Glaspy's conclusions would still be consistent with the evidence. The medical records submitted by Plaintiff appear to use both the Nottingham grading system and Dr. Glaspy's approach to classification. (Plaintiff's Opposition, Exh. B, ECF No. 86 at pg. 29.) Even under the Nottingham system used in *Rhodes*, the records submitted appear to indicate that Plaintiff's tumor was aggressive. *Rhodes*, 967 F.Supp.2d at 280 ("The grading system endorsed by the AJCC is the Scarff Bloom Richardson System (also referred to as the Nottingham grading scheme), which has three grades . . . [t]he higher the grade, the more aggressive the tumor."). The pathology analysis, dated November 28, 2011, indicates that Plaintiff's cancer received a Nottingham grade of three out of three. (Plaintiff's Opposition, Exh. B, ECF No. 86 at pg. 29 ("Poorly differentiated infiltrating ductal carcinoma (nuclear score 3, tubule score 3, mitotic score 3; Nottingham grade 3 of 3.").) This finding is consistent with and supports Dr. Glaspy's conclusion: that Plaintiff's cancer was aggressive and fast-growing.

Plaintiff also discusses specific disagreements she has with Dr. Glaspy. In particular, she states that hormone dependent cancers are the fastest growing cancers, but that her cancer was not hormone dependent, a fact that Dr. Glaspy acknowledges in his declaration. (Glaspy Decl. ¶ 12, ECF No. 84-4 at pg. 135 ("the tumor had no estrogen or progesterone receptors, and was a very aggressive, fast-growing type of cancer."). But Dr. Glaspy's statement does not say that Plaintiff's cancer was *the fastest*-growing type of cancer—it seems to say only that Plaintiff's cancer was *a* particularly aggressive, fast-growing type of cancer. In other words, even if Plaintiff's cancer type was not the absolute fastest-growing, it could still have been a fast-growing

cancer relative to other cancers and may not have existed at the time of the June 2009 mammogram.

For similar reasons, the Court is unpersuaded by Plaintiff's argument that the size of her tumor fluctuated or stopped increasing between September 2011 and December 2011—and, in any case, that argument appears to be incorrect. A mammogram on September 19, 2011 indicated that the then-suspected tumor was "approximately 3.5 cm in diameter." (Evidence in Support of Motion for Summary Judgment, Exh. A, ECF No. 84-3 at pg. 16.) One month later, on October 14, 2011, an ultrasound showed that the tumor measured "approximately 3.6 cm in maximum diameter." *Id.* at 14. By the time it was partially excised in November 2011, the tumor was "at least 4 cm." *Id.*, Exh. B at pg. 47. None of the challenges regarding the growth rate of Plaintiff's tumor raise an issue of material fact.

Most importantly, Plaintiff does not put forth any evidence to suggest that Defendant had subjective knowledge of any risk to her or that he consciously disregarded that risk. In other words, Plaintiff has not submitted evidence showing that Defendant knew that she had a tumor in June 2009 or was otherwise deliberately indifferent to her need for treatment. A mere mistaken diagnosis does not give rise to a constitutional claim. Absent any such evidence, Plaintiff cannot sustain a § 1983 claim.

## V. CONCLUSION

For the foregoing reasons, the Court finds that Defendant is entitled to summary judgment as a matter of law because there is no genuine issue of material fact as to an element of Plaintiff's § 1983 cause of action. Plaintiff has been unable to establish that Defendant falsified any medical records or misdiagnosed her medical condition and thus cannot show that Defendant was deliberately indifferent to her medical needs. Defendant's Motion for Summary Judgment (ECF No. 84) is GRANTED in full.

\\\
\\\
\\\
\\\

The Clerk of the Court is DIRECTED to close the case.

IT IS SO ORDERED.

Dated:   **December 16, 2016**                    /s/ *Erica P. Grosjean*
                                                    UNITED STATES MAGISTRATE JUDGE